# In the
# United States Court of Appeals
## For the Seventh Circuit

—————————

No. 04-2691

LATINO FOOD MARKETERS, LLC and
MEXICAN CHEESE PRODUCERS, INC.,

*Plaintiffs-Appellees*,

*v.*

OLÉ MEXICAN FOODS, INC.,

*Defendant-Appellant.*

—————————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03 C 0190—**Barbara B. Crabb**, *Chief Judge.*

—————————

ARGUED JANUARY 19, 2005—DECIDED MAY 12, 2005

—————————

Before CUDAHY, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* At long last, Latino Food Marketers and Olé Mexican Foods have come to an agreement. Unfortunately, the only thing they agree on is that they disagree about whether they ever made an agreement in the first place. A jury found that they did not, and Olé, the party unhappy with the verdict, appeals.

Latino sells Mexican-style cheese products made by a company, Mexican Cheese Producers, Inc. Miguel and

Martina Leal are the controlling owners of both companies. Olé, which sold cheese manufactured by Mexican Cheese Producers for several years, began buying directly from Latino in September 2001.

The two sides soon began negotiating a 3-year contract for Olé to continue buying cheese directly from Latino. The biggest sticking point was that Latino wanted Olé to promise to buy exclusively from Latino, while Olé wanted to be free to purchase from other manufacturers. On November 9, 2001, Olé faxed Latino a draft contract that did not promise exclusivity. Three days later, Latino handwrote changes that made the contract exclusive, limited a lower price guarantee from the entire world to the southeast United States, and allowed for mutual changes in the products covered. Leal signed the contract and faxed it to Olé, with instructions for Veronica Moreno, vice-president of Olé, to sign the agreement and fax it back to Latino.

This case essentially turns on what happened next. Olé says it signed the agreement and sent it back to Latino by Federal Express on November 16, 2001. Latino claims it never received a signed contract. On November 21, Moreno called Leal, angry that Latino had threatened to stop shipping Olé's orders because it had not been paid. Leal claims that Moreno told him that she would not sign the contract. On November 29, Leal sent an e-mail to Albert Garcia, Latino's future sales broker, telling him that Moreno did not want to sign the contract.

Despite the dispute, Latino continued shipping products and Olé continued paying for them, even as both sides complained about the other's performance on numerous occasions. Although it was still selling to Olé, Latino claims it never thought the two sides had agreed to the original deal and did not realize that Olé thought there was a valid contract until the two sides met on February 10, 2003, to discuss a number of issues. After that meeting, Latino

asked to see the signed contract. Olé faxed Latino a copy of the proposed deal, but it was not signed by Olé.

Dealings between the two companies finally broke down in April 2003. Latino filed suit in the Western District of Wisconsin, claiming Olé owed it more than $1.1 million for cheese it had received from Latino. Olé responded with its own suit for 17 causes of action against Latino in the Northern District of Georgia. The Georgia court eventually dismissed Olé's lawsuit under the first-to-file rule. Olé then filed a motion to dismiss the Wisconsin suit based on a forum selection clause in the disputed contract that required all litigation to be brought in Georgia.

The district court (Chief Judge Barbara B. Crabb) scheduled an evidentiary hearing on Olé's motion to dismiss. Just before the hearing, Olé produced what it claimed was a valid, signed copy of the contract. Because Latino disputed its authenticity, however, the hearing proceeded. After 3 days of testimony and argument, Judge Crabb concluded (for purposes of venue only regarding the forum selection clause) that Olé did not show that a valid contract existed, meaning that the suit could continue in the Wisconsin court. Olé filed its answer, along with 17 counterclaims, 16 of which were dismissed.

The case then proceeded to trial. The jury found that the parties never entered into the disputed contract but also found in favor of Olé on part of its claim that Latino breached its duty of good faith. At the end of the day, Olé owed Latino $1,121,913 on its contract claim, and Latino owed Olé $954 on its good-faith claim. Olé appeals, claiming that Judge Crabb erred (1) in denying its motion for directed verdict, (2) in failing to give certain jury instructions, and (3) in improperly placing the burden of proof on Olé rather than Latino. Olé also argues the judge erred in failing to admit evidence of FDA standards for unfit products and in granting Latino's motion for summary judgment on Olé's fraudulent misrepresentation counterclaim.

Olé first argues that the judge erred in denying its motion for judgment as a matter of law on the question of whether Ole and Latino entered into the contract in question. We review the denial *de novo* and will affirm if any reasonable jury could have found that there was no agreement. Our job is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support its verdict. *See Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004).

Olé argues that, whether or not both sides actually *signed* the contract, the evidence was clear that they *agreed* to it. It suggests that Moreno orally agreed to Latino's proposed changes to Olé's written contract offer during the November 2001 phone call with Leal. Latino contends the two sides were still negotiating and never came to a full understanding.

Wisconsin law governs this case, and under that law, although an agreement need not be in writing to be valid, *see Zeige Distrib. Co. v. All Kitchens, Inc.*, 63 F.3d 609, 612 (7th Cir. 1995) ("[I]n order for acceptance of a contract to occur, there must be a meeting of the minds, a factual condition that can be demonstrated by word or deed."), the jury here could most certainly have reasonably concluded that there was no agreement. Moreno testified that, during her phone call with Leal, the parties agreed to certain changes, then promised that both would sign the agreement. But Leal testified that the week after he faxed the proposed amended contract to Olé, Moreno called him and threatened not to sign it. That threat suggests that she did not think that the parties would be bound until the contract was signed; otherwise, it would have been little more than an empty threat. And if Olé was free to back out of the deal, as Moreno seems to have thought, so was Latino. Thus, it was reasonable for the jury to find that there was no agreement.

Olé also claims the fact that Latino shipped products to it proved that Latino believed the two sides had an agreement. While that is one plausible interpretation, it is also reasonable to imagine that Latino continued shipping products to Olé simply because it wanted to make as many sales as possible, regardless of whether it believed the two sides had made any binding contractual promises to each other. Deciding which explanation made more sense was best left to the jury, and Judge Crabb did not err in failing to substitute her judgment for its after the verdict was returned.

In a related argument, Olé claims that the judge erred in failing to give the Wisconsin pattern jury charge instructing that acceptance of a contract may be inferred from conduct. We review decisions regarding instructions for an abuse of discretion. *Spiller v. Brady*, 169 F.3d 1064, 1066 (7th Cir. 1999).

Olé asked for an instruction that "acceptance of the contract may also be implied from the conduct of the parties." Olé says it presented evidence that both sides performed as though they were bound by the contract and that Latino added Olé as an additional insured on its insurance policy, enough, it claims, for the jury to find an implied contract.

The problem for Olé is that it barely argued for the existence of an implied contract during the trial. Instead, Olé focused almost exclusively on its claim that it had a legitimate signed contract. That was an understandable tactical decision, as Olé might have worried that pressing an implied contract argument would reduce the chances that the jury would believe that there was an actual contract. But having put so much emphasis on its contention that there was a valid signed agreement, Olé cannot now complain that the judge did not give adequate attention to an argument that Olé itself virtually ignored.

Similarly, Olé claims that the judge erred in failing to instruct the jury that "[a] party may accept a contract in a manner or method other than the manner or method requested by the offering party" and that a written agreement may be effective even if both parties have not signed it. But while Judge Crabb didn't use that language in her charge to the jury, she clearly incorporated the concept when she told it that "acceptance may be made by a communication to the offeror, either in writing or orally." Thus, the jury knew that it could find a valid contract even if it did not believe Olé's claim that it signed the agreement.

Olé next claims that the judge erred at the evidentiary hearing on Olé's motion to dismiss by placing on it the burden of proving that the contract was signed. Citing Wisconsin Statute § 891.25, Olé contends that its production of a written contract should have shifted the burden to Latino to prove that the contract was not validly executed. Olé also claims the judge erred in rejecting its request that the jury be instructed on a § 891.25's effect on the burden of proof.

We note first that Olé failed to argue § 891.25's application until after the evidentiary hearing, but it shouldn't have made any difference. Latino sued not on the original contract—it claimed the two sides never agreed to that one—but on a contract it claimed was formed through purchase orders and other dealings. And Latino successfully showed that the Western District of Wisconsin was an appropriate place for a suit on that contract to take place. Olé was free to argue, as it did, that there was no contract formed through the purchase order process because there was a prior controlling agreement, but that argument most closely resembles an affirmative defense. Thus, the burden was appropriately placed on Olé to prove the existence of the original agreement.

Section 891.25 does not change that analysis. That statute, in part, says:

> When any written instrument constitutes the subject of the action or proceeding or when the signing of such instrument is put in issue and the instrument purports to have been signed, the instrument itself is proof that it was signed until denied by oath or affidavit of the person by whom it purports to have been signed or by a pleading.

Therefore, even if Olé had properly raised the argument, § 891.25 would only have concerned the question of whether Moreno actually signed the contract. But that was never an issue. Latino questioned *when* Moreno signed the contract but never disputed *whether* she did so. Thus, Olé had the burden of proving the existence of the contract, *see, e.g., Bantz v. Montgomery Estates, Inc.*, 473 N.W.2d 506 (Wis. Ct. App. 1991), and there was no error.

Olé's final two claims can be quickly resolved. First, it argues that Judge Crabb erred in refusing to take judicial notice of FDA standards it says supported its claim that Latino acted in bad faith by shipping contaminated products. But, once again, Olé is arguing that the judge hurt its ability to contest a fact that was never contested. Latino never claimed that some of the products were not contaminated; the question was whether Latino intentionally shipped bad products. Olé claims it wanted to use the FDA standards to impeach Latino's claim. But Latino never claimed that its products met FDA standards, so there was no testimony or witness to impeach.

Finally, Olé challenges the dismissal of its counterclaim that Latino made fraudulent representations to induce Olé to continue buying exclusively from Latino. Olé claims Latino intentionally misrepresented that it was selling to Olé at its lowest prices and that it was not selling directly to Olé's customers.

Olé's claim runs into trouble, however, because of its failure to plead its claim with particularity and the fact that the

claim might be barred by the economic loss doctrine. Worse still, Olé never offered any evidence that it reasonably relied on the alleged misrepresentations, as required to state a claim for fraudulent misrepresentation. *See, e.g.*, *Hennig v. Ahearn*, 601 N.W.2d 14, 24 (Wis. Ct. App. 1999). In addition, as Judge Crabb noted, Olé admitted in its counterclaim that it knew that Latino was selling cheese to one of Olé's customers, making any reliance unreasonable. The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*