In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3401

MICHAEL EVANS,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, ANTHONY KATALINIC, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3570—**David H. Coar,** *Judge.*

ARGUED SEPTEMBER 18, 2007—DECIDED JANUARY 23, 2008

Before EVANS, WILLIAMS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* This is the second time we are considering Michael Evans' case against the City of Chicago and several of its police officers alleging that the defendants conspired to falsely convict him of the abduction, rape, and murder of 9-year-old Lisa Cabassa 31 years ago. In 2006, we affirmed the district court's denial of the police officer defendants' motion for summary judgment based on their claim of qualified immunity. *Evans v. Katalinic*, 445 F.3d 953 (7th Cir. 2006). Now, after a jury returned a verdict for the City and its officers, we consider several trial-related rulings on Mr. Evans' appeal. In particular, we review whether the district court's

decision shortly before trial *both* to allow several officers who had declined all previous discovery requests on Fifth Amendment grounds to testify *and* to exclude evidence of their prior silence is consistent with *Harris v. City of Chicago*, 266 F.3d 750 (7th Cir. 2001).

Twenty-seven years after his conviction, DNA testing established that neither Evans nor his co-defendant, Paul Terry, was the source of semen found on Lisa Cabassa's body. Their convictions, based in significant part on the testimony of a woman named Judy Januszewski, were eventually vacated. The state's attorney declined to reprosecute and Governor Rod Blagojevich subsequently pardoned Evans (and Terry) on the basis of innocence.

In 2004, Evans filed this suit pursuant to 42 U.S.C. § 1983, claiming that the police officers' efforts to get Januszewski to identify and testify against him, along with other alleged improprieties, deprived him of due process. (Our 2006 decision contains a full discussion of these facts, so we will not repeat them here.)

Back in 2004, Evans sought to depose the defendant officers. The officers instead moved for a protective order, arguing that they should not have to be deposed in light of an ongoing investigation by a special prosecutor into certain abuses committed by police officers in their area headquarters around the time of the Cabassa investigation.[1] Acknowledging that the Cabassa case may have been

---

[1] In 2002, the Circuit Court of Cook County appointed a special prosecutor "to investigate allegations of torture, perjury, obstruction of justice, conspiracy to obstruct justice, and other offenses by police officers under the command of Jon Burge at Area 2 and Area 3 Headquarters in the city of Chicago during the period from 1973 to the present." (The Cabassa investigation fell within the applicable area and time period but was not under

(continued...)

within the special prosecutor's investigation—an issue the parties still debate—Magistrate Judge Schenkier gave the officers until January 31, 2005 (mid-way through discovery) to decide whether to participate in discovery or assert a privilege. When January arrived, Officers Dignan, DiGiacomo, Hill, Katalinic, McKenna, Leracz, Ryan, and Swick (the "5A officers") took the same position: all declined to testify, asserting their rights under the Fifth Amendment.

On November 22, 2005, after fact discovery had closed but before the close of all discovery, Katalinic changed his mind and offered to waive his Fifth Amendment privilege. He then filed an amended answer and amended discovery responses. In the final pretrial order, filed on January 13, 2006, the defendants listed Katalinic as a "will call" witness.

On January 14, 2006, Evans moved to bar the testimony of the 5A officers. He acknowledged that Katalinic was an "arguable exception" but maintained that Katalinic had to move to reopen discovery and seek a new deposition. On January 16, Katalinic so moved. On January 18 (12 days before the scheduled trial), the other 5A officers requested similar treatment if the special prosecutor's report vitiated their concerns about self-incrimination. The case was then stayed until May 1 during the qualified immunity appeal.

---

[1] (...continued)
Burge's command.) During the investigation, the special prosecutor subpoenaed 40 Chicago police officers, including three of the named defendants in this case (Dignan, Hill, and Katalinic), to testify before a special grand jury. Most of the officers refused to testify on Fifth Amendment grounds. In April 2006, the special prosecutor completed his investigation. His July 19, 2006, report concluded that the statute of limitations had run.

The 5A officers renewed their request to testify on May 16, 2006, maintaining that the forthcoming release of the special prosecutor's report would allow them to reevaluate their position. They offered to respond to discovery, make themselves available for depositions, and give Evans additional follow-up time if they decided to testify. Evans opposed this motion, arguing that such relief would effectively deny him the benefits of discovery.

On May 19, 2006, District Judge David Coar rejected the 5A officers' request, saying that they had "made a calculated determination, and [would] be bound by their determination." Despite this statement, Judge Coar *expressly* reserved ruling and allowed the parties to brief the issue.

On June 2, 2006, Judge Coar took up the issue again. This time he sided with the 5A officers. Regarding Katalinic, Judge Coar ruled that he had "made a more timely request" and therefore could testify if he answered all written discovery and appeared for a deposition within 10 days. As to the other 5A officers, Judge Coar found that they had not "acted timely" and that "there is prejudice." However, Judge Coar gave them the same opportunity to testify under the same conditions as Katalinic. Evans then requested that, if the 5A officers decided to testify, they give an explanation regarding their decision, considering that the special prosecutor's report still had not been issued (although his investigation recently had ended). Evans also asked for the opportunity to object based on the officers' justification. Judge Coar responded that Evans' counsel could make whatever objections he wanted, but the schedule would stand.

On June 5, 2006, Evans offered to waive punitive damages against any 5A officer who agreed not to testify.

Dignan accepted Evans' offer.[2] The other officers chose to testify, serving Evans with written discovery and submitting to redepositions, which were completed by July 8.[3]

On July 6, 2006, Evans submitted a motion requesting that the 5A officers either be defaulted or bound to their prior privilege assertions. The 5A officers filed a cross-motion to bar any mention of their prior Fifth Amendment assertions. Judge Coar took up both motions on July 11, 2006, just before opening statements. In a brief ruling, Judge Coar denied Evans' motion and granted the officers'. Thus, Evans' counsel was barred at trial from making any reference to the 5A officers' prior invocation of their Fifth Amendment privilege.

That same day, Judge Coar also ruled on the defendants' motion to bar the testimony of Dignan, the officer who accepted Evans' offer and would be asserting his Fifth Amendment rights in response to all questions at trial. Instead of allowing Evans to call Dignan to the stand, Judge Coar ruled that he would instruct the jury that Dignan had refused to answer questions about the case and that they could draw an adverse inference from his refusal to take the stand.

---

[2] Dignan later tried to waive his Fifth Amendment privilege and testify, but Judge Coar made him stick to his deal.

[3] The redepositions were heated to say the least. The controversy seems to have revolved around the presence of Flint Taylor, Paul Terry's attorney, who was one of Evans' trial counsel but not an attorney of record at the time. According to the 5A officers, Evans "insisted" on Taylor's attendance and "refused" to proceed without him. Evans, on the other hand, claims that Taylor had sat in on depositions previously without objection and that several 5A officers unjustifiably "walked out" on their redepositions.

Finally, near the end of the trial, Judge Coar ruled on Evans' proposed instructions, verdict form, and special interrogatory allowing the jury to find for him it if determined that his rights were violated by "any" City of Chicago employee "other" than the named officers. Judge Coar rejected this language as confusing and beyond the jury's responsibility. However, he adopted Evans' proposed conspiracy instruction, providing for liability if "at least one defendant acting voluntarily and in concert with at least one other person" violated Evans' rights.

The case went to the jury on four claims: federal due process, conspiracy, and failure to intervene claims, and a state law malicious prosecution claim. The jury returned a verdict that exonerated the officers, and on August 8, 2006, Judge Coar granted judgment on the verdict. On August 29, he corrected the judgment to include the City of Chicago. This appeal followed.

Of the three arguments raised on this appeal, 70 percent of the ink in the briefs is expended on the question of how Judge Coar resolved the thorny matter of the Fifth Amendment issue regarding the 5A officers. We will consider that matter last, after we briefly resolve the two other issues raised by Mr. Evans:  the handling of Dignan's Fifth Amendment issue and the rejection of certain proposed instructions and verdict questions regarding the City's liability.

Because an adverse inference can be drawn in a civil case when a witness refuses to answer a question on Fifth Amendment grounds, a party seeking to benefit from the inference always prefers to maximize and dramatize the moment. And that's what Evans wanted to do: call Dignan as a witness so the jury could watch him take the

oath and then decline to answer a series of questions.[4] Evans' desire to proceed in this fashion is certainly understandable. But Judge Coar elected to bring Dignan's assertion of his Fifth Amendment rights to the jury in a less dramatic fashion, and we can reverse his decision on this point only if it was a clear abuse of his discretion. *See Doe v. Smith*, 470 F.3d 331, 341 (7th Cir. 2006). And this we cannot do.

Evans argues that, under *Baxter v. Palmigiano*, 425 U.S. 308 (1976), he had a right to call Dignan to the stand solely to invoke his Fifth Amendment privilege. That claim is too broad. In *Baxter*, the Supreme Court held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]" *Id.* at 318. We have interpreted *Baxter* to mean that the negative inference against a witness who invokes the Fifth Amendment in a civil case is permissive, not required. *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993).

The situation presented here was rather unique. Evans candidly admits that he was "pleased" when Detective Dignan accepted his offer to rid himself of the punitive damage claim against him in exchange for a promise to continue to assert his Fifth Amendment privilege. Given this rather unusual scenario, it would be difficult to conclude that Judge Coar abused his discretion by not embracing this situation for its maximum effect.

The judge instructed the jurors that they could draw an adverse inference as to liability based on Dignan's asser-

---

[4] A witness's answer could range from "I refuse to answer on the ground that my answer may tend to incriminate me" to the more mundane "On the advice of counsel, I decline to answer."

tion of the Fifth Amendment to questions about the case. There is no reason to think that the jurors ignored the instructions or assumed that Dignan was not asked questions relevant to Evans' claims. Indeed, during closing argument, Evans' counsel articulated specific questions that Dignan refused to answer, such as, "did you conspire to frame Michael Evans with the other defendants?" The jury's verdict indicates that it declined to draw a negative inference from Dignan's assertion of his Fifth Amendment rights. Given this state of affairs, we find no error in how Judge Coar decided to resolve the issue.

We turn next to the claim that Evans' proposed instructions, verdict form, and special interrogatory regarding the City of Chicago's liability were wrongly rejected. We review decisions regarding instructions and the like for an abuse of discretion. *Latino Foods Marketers, LLC v. Olé Mexican Foods, Inc.*, 407 F.3d 876, 880 (7th Cir. 2005).

Evans' instructions, verdict form, and special interrogatory concerned an agreed-upon stipulation that the City would accept judgment against it "if and only if the finder of fact in this case finds that City employees violated plaintiff's constitutional rights as alleged in the first amended complaint." Thus, the City waived its right under *Monell v. New York City Department of Social Services* not to be held liable in damages without proof that the City by its "policy or custom" caused the alleged constitutional violation. 436 U.S. 658, 694 (1978). Evans' proposed instruction allowed the jury to find for him if it determined that his rights were violated by "any other" City of Chicago employee (that is, other than the named defendants). Judge Coar rejected this language but adopted Evans' proposed conspiracy instruction, providing for liability if "at least one defendant acting voluntarily and in concert with at least one other person" violated Evans' rights.

Evans argues that the omission of his proposed language created a "gap" in liability such that he was not allowed to prove his *Monell* claims. We disagree. Judge Coar rejected Evans' proposed language because he thought it would confuse the jury and went beyond its responsibility: "[T]his jury is only concerned about what the named defendants did. As to unknown other city employees, this jury will not be asked to cast a verdict with respect to them, and they could not cast a verdict with respect to them." Indeed, because Evans' first amended complaint did not name unknown officers[5] or the estates of deceased officers as defendants, asking the jury to pass judgment *solely* on "other" City employees was not appropriate. Any act committed by both named defendants *and* "others" was covered by the conspiracy instruction. The jury's verdict meant that no person— known, unknown, living, or deceased—conspired with any named defendant to violate Evans' rights. There was no "gap" in liability.

Evans also maintains that he was entitled to his proposed instruction under the agreed-upon stipulation. This argument fails as well. The stipulation's plain language does not permit recovery upon a showing that "any" City employee violated Evans' rights, just those employees "as alleged in the first amended complaint." As noted, Evans' first amended complaint did not name unknown officers or the estates of deceased officers as defendants. He therefore was not entitled to his proposed instruction under the stipulation.

Evans lastly cites *Kunz v. City of Chicago*, No. 01 C 1753 (N.D. Ill. filed Mar. 12, 2001), and *Bond v. Utreras*, No. 04 C 2617 (N.D. Ill. filed Apr. 2, 2004) in support of his

---

[5] Evans' initial complaint included "unknowns," but his first amended complaint substituted Officers Ryan and Swick.

position. These cases are distinguishable. In *Kunz*,[6] Kunz filed an amended complaint naming "other unknown Chicago police officers" as defendants after discovering that the proposed stipulation did not include them, and the City amended its stipulation accordingly. By contrast, Evans' amended complaint did not name unknown officers as defendants. In *Bond*, Bond objected to the City's proposed stipulation, and the City agreed to broaden it. Here, although Evans initially objected to the stipulation, he never asked the City to amend it and eventually accepted it as proposed. Judge Coar therefore did not abuse his discretion in rejecting Evans' instruction.

We finally approach the main event: whether Judge Coar erred in allowing the 5A officers to withdraw their privilege and testify—while simultaneously excluding evidence of their prior silence if they were deposed prior to trial. We review a district court's decision to allow withdrawal of a privilege for an abuse of discretion. *See United States v. 4003-4005 5th Ave., Brooklyn, NY*, 55 F.3d 78, 85 (2d Cir. 1995) ("[A]s long as a trial court considers the relevant factors and acts with moderation to accommodate both a litigant's valid Fifth Amendment interests and the opposing parties' needs . . . we will not disturb the measures used by that court in the exercise of its discretion."). The same standard applies to a court's exclusion of evidence, including evidence of privilege, *see Harris v. City of Chicago*, 266 F.3d 750, 755 (7th Cir. 2001) (finding an abuse of discretion where the district court precluded evidence of prior silence after defendants evaded all discovery), and its treatment of alleged discovery abuses. *Johnson v. J.B. Hunt Transp., Inc.*, 280 F.3d 1125, 1130-31 (7th Cir. 2002).

---

[6] One of Evans' counsel in this case was also Kunz's counsel in that case.

We now recall, in some detail, the events that brought this issue to the fore. Five weeks before trial, Judge Coar ruled that, despite having sat out discovery on Fifth Amendment grounds, the 5A officers could testify, if they met certain conditions. He explained his decision as follows:

> I don't think that the [5A officers] have acted timely, and there is prejudice. Despite what the police officer defendants say, I think there is prejudice. However, I'm going to give them the same opportunity [as Katalinic]. If they wish to testify, they have to declare that by Wednesday, provide answers to all outstanding discovery, and appear for a deposition within 10 days.

The 5A officers met the three conditions laid down by the judge.[7]

Just before the start of the trial, Judge Coar granted the 5A officers' request to exclude evidence of their prior silence. He also rejected Evans' request to impose discovery sanctions for bad faith. His ruling was brief:

> Police officers' motion in limine to bar adverse inference and reference to defendants taking the 5th Amendment. It's denied—I mean, I'm sorry. The motion in limine is granted.
>
> Now, we can also address this motion, the plaintiff's motion with respect to bad faith. That motion is denied. There may be a way to deal with that. This is not the way to deal with it.

---

[7] We refer the reader to footnote 3 where we noted the "heated" nature of the redepositions. While we agree with the dissent that the redepositions did not go smoothly, we believe that Judge Coar was in a far better position than we are to evaluate the parties' motives, and so we defer to his conclusion that the officers eventually satisfied the conditions.

We first address Judge Coar's decision not to impose discovery sanctions for what Evans says was a bad-faith invocation of the Fifth Amendment. "To be privileged by the Fifth Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have *some* tendency to subject the person being asked the question to criminal liability." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663-64 (7th Cir. 2002). A district court has the ability to dismiss a case or to enter default judgments against parties who refuse to comply with discovery orders. *See* Fed. R. Civ. P. 37(b)(2)(C). However, "[t]his drastic sanction requires a showing of 'willfulness, bad faith, or fault' on the part of the disobedient party, but . . . is otherwise within the discretion of the court." *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 75 (7th Cir. 1992) (internal citation omitted).

The record supports Judge Coar's decision to deny sanctions. Specifically, Judge Coar reasonably could have concluded that the officers were not "gaming" the system but rather were concerned about the special prosecutor's investigation, which was only recently completed when they decided to testify. When asked to explain why they invoked the Fifth Amendment in this case, three of the officers (Hill, Katalinic, and McKenna) indicated that they made the decision upon the advice of their attorneys after the special prosecutor contacted them. Ryan, who did not consult with counsel, said that he thought that the special prosecutor's case was "broad" and did not know if he was a target. McKenna also stated that he had been told by one of Evans' trial counsel (or, at least, in that counsel's presence) that if he answered questions about the Cabassa investigation, he would waive his right to assert the privilege in response to

questions about other investigations.[8] These reasons indicate a good-faith invocation of the Fifth Amendment.

Nevertheless, Evans maintains that the 5A officers *explicitly admitted* in their redepositions that no good-faith basis ever existed to invoke their Fifth Amendment privilege. Read literally and without context, some testimony may indicate as much. However, it is clear that several of the officers were confused by Evans' counsel's questions on this issue. Katalinic's redeposition provides a good example:

> Q:  All right. What was the factual basis for a good faith basis to believe that truthful answers about the Cabassa investigation could incriminate you, sir?
>
> [Objections to form raised.]
>
> The Witness:  I don't understand the question. I'm sorry.
>
> Q:  Was there any good faith basis for you to believe that if you gave truthful answers about what you did in the Cabassa investigation, you could incriminate yourself?
>
> [Same objection and objection that question may call for a legal conclusion raised.]
>
> The Witness:  I did nothing wrong in this case.
>
> Q:  Are you aware of any facts that would suggest that you could incriminate yourself if you testified truthfully about them?
>
> The Witness:  I didn't do anything wrong in this case. I don't—

---

[8] Evans eventually dismissed DiGiacomo and Swick, so we will not consider their testimony.

As this segment illustrates, the officers seemed to think that they were being asked if they did anything wrong during the Cabassa investigation and, not surprisingly, answered "no." However, denying wrongdoing is different than admitting that there was no basis for invoking the Fifth Amendment. Because there was evidence that the officers held a reasonable belief that they could be targets of the special prosecutor's investigation, we cannot say that Judge Coar abused his discretion in declining to impose discovery sanctions.

The more difficult question is whether Judge Coar's decision *both* to allow the 5A officers to testify *and* to exclude evidence of their prior silence is consistent with our decision in *Harris v. City of Chicago.*

In *Harris,* the plaintiff brought a § 1983 claim against an arresting officer, Alex Ramos, and the City of Chicago, alleging federal and state law malicious prosecution. During discovery, Ramos refused to respond to any discovery requests, instead invoking his Fifth Amendment privilege. At trial, however, Ramos answered all questions posed to him, and all evidence of his prior silence was excluded. After a jury verdict for the defendants and a denied motion for a new trial, Harris appealed, arguing that Ramos was allowed to avoid the discovery process altogether. We reversed and remanded for a new trial. Because Ramos did not abandon his Fifth Amendment privilege until "just prior to trial," the probative value of his prior silence was high and outweighed its prejudicial effect. *Harris,* 266 F.3d at 755. Therefore, "it was error for the district court to exclude Ramos's prior silence because the effect of such a ruling would be tantamount to allowing Ramos to avoid discovery altogether." *Id.* at 754. We concluded that the district court should have either bound Ramos to his prior privilege assertions or allowed Harris to impeach him with his prior silence. *Id.*

When he permitted the 5A officers to waive their privilege and testify, Judge Coar made specific *Harris* findings. First, he found that, with the exception of Katalinic, the 5A officers had not "acted timely." He also twice stated that there was prejudice from the officers' late request.[9] Thus, Judge Coar explicitly determined that *Harris* applied to the 5A officers' situation and decided to let them testify. However, instead of allowing Evans to impeach the 5A officers with their prior silence, he ordered the officers to answer all discovery requests and submit to redepositions before trial.

There are two ways to view Judge Coar's decision: (1) a misapplication of law, directly contradicting *Harris* by refusing to admit evidence of prior silence after a finding of untimeliness, or (2) a discretionary ruling, attempting to cure the inadequate-discovery prejudice by providing a remedy that was not available in *Harris*. This is a close call because Judge Coar did not explicitly state that he was attempting to cure the prejudice when he allowed the 5A officers to testify. However, the fact that Judge Coar allowed the parties to brief the issue and then made specific *Harris* findings shows that he was exercising his discretion. *Cf. Carr v. O'Leary*, 167 F.3d 1124, 1127 (7th Cir. 1999) ("[A] discretionary ruling . . . cannot be upheld when there is no indication that the judge exercised discretion."). Because Judge Coar was exercising his discretion, we view his ruling as an attempt to cure the prejudice. And we "will not reverse if we merely conclude that we would have reached a different decision

---

[9] In their brief, the defendants waste a lot of time arguing that the 5A officers acted timely and that there was no prejudice. These are baffling claims. Not only had Evans been deprived of *all* discovery from the 5A officers until Judge Coar's ruling, but *the court made specific findings of untimeliness and prejudice.*

if asked to consider the issue in the first instance[.]" *Hall v. Norfolk S. Ry. Co.*, 469 F.3d 590, 594 (7th Cir. 2006).

Judge Coar reasonably could have determined that ordering additional discovery cured any prejudice. The trial had not yet begun when the officers waived the privilege, which gave them time to provide amended answers to all discovery and appear for redepositions. This fact distinguishes *Harris* because, there, the defendant made no attempt to amend or supplement his interrogatory responses, produce any documents, or waive his Fifth Amendment privilege prior to trial. 266 F.3d at 753-54. Thus, the plaintiff in *Harris* was forced to question the officer at trial "without the benefit of *any* discovery," which severely hindered his ability to formulate a trial strategy. *Id.* at 755 (emphasis added). Because there was no opportunity to order additional discovery after the privilege was waived, the adequacy of such a remedy was never discussed. Nevertheless, we interpret *Harris* to imply that, if additional discovery alleviates the prejudice from an untimely request to testify, the district court *may* exclude evidence of prior silence because "the effect of such a ruling would [no longer] be tantamount to allowing [a party] to avoid discovery altogether." *Id.* at 754.[10]

We have some concerns that ordering redepositions 5 weeks before the scheduled start of the trial was not

---

[10] This does not mean, as the dissent suggests, that "[the fact situation in *Harris*] is the *only* situation where sanctions are appropriate." On the contrary, had the district judge awarded sanctions here, we also may have found that decision appropriate under the rule announced in *Harris*. But because that question is not before us today, we disagree with the dissent that our decision is "too narrow" and "inconsistent" with *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989) (affirming the district court's decision to bar an officer from testifying where he invoked his Fifth Amendment privilege during discovery but changed his mind one month before trial).

enough to cure the prejudice in this case. Indeed, the primary remedy that Evans now seeks is a new trial to provide him with more time for fact and expert discovery. Notably, however, when Judge Coar ruled that the officers would be allowed to testify, Evans did not seek a continuance. He only asked for an explanation from the officers about their change of heart and for the opportunity to object based on that explanation. Evans did file several motions on the privilege issue after Judge Coar's ruling, but these motions sought to bind, bar, and default the officers—relief that Judge Coar already had partially denied—not to obtain additional time for discovery.

Evans offers two explanations for his decision not to ask for more time. First, he maintains that he did not seek more time because he was expecting to impeach the officers with their prior silence under *Harris*. But, because Judge Coar had not yet ruled on that issue, Evans should not have assumed that the court would see the issue his way. In addition, Magistrate Judge Schenkier indicated that the admissibility of the prior silence was an open question, giving Evans further notice that Judge Coar might not allow questions to be asked of the officers regarding their prior silence.

Second, Evans argues that asking for more time would have been futile. However, the record indicates otherwise. Earlier in the proceedings, Judge Coar stated that he would grant what he believed to be an agreed-upon motion for postponement. He later denied the motion only because Evans did not agree to it. Closer to trial, Judge Coar did deny requests for continuances for scheduling conflicts and expressed a strong desire to stick with the scheduled start date, but he never rejected postponing

the trial for Evans' additional discovery.[11] Indeed, Judge
Coar never had the opportunity to rule on such a motion
because Evans never filed one.

In sum, we reject Evans' claim that three of Judge Coar's
rulings entitle him to a new trial. We specifically find
that, by ordering additional discovery, Judge Coar sought
to alleviate the prejudice from the officers' untimely
request to testify—a remedy that was not available to
the district court in *Harris*. The decision to grant such a
remedy while excluding evidence of prior silence is dis-
cretionary, and we cannot say that Judge Coar abused
his discretion in this case. We might well have reached
a different decision if asked to consider the matter in
the first instance, but that—substituting our judgment
for that of the trial judge on the firing line—is something
we are not permitted to do.

Before leaving, we wish to comment on the dissent's
claim that our opinion, which we think is consistent with
*Harris*, "ratifies" a "neat maneuver" by the police officer
defendants. We disagree. It does not appear to us that
the defendants were gaming the system. Katalinic
moved to be permitted to withdraw his refusal to testify
in November of 2005. The other officers followed suit in
January of 2006, around the time the special prosecutor
was wrapping up his probe. In June, 5 weeks before
the scheduled start of the trial, Evans offered to waive
claims for punitive damages against any officer who

---

[11] The dissent misconstrues this sentence as stating that "the
district judge *merely* denied motions to continue based on
'scheduling conflicts.'" (Emphasis added.) On the contrary, we
agree that the district court seemed disinclined to move the
trial date. But, we do not agree that his comments, taken as a
whole, clearly show that filing a continuance motion for addi-
tional discovery would have been futile.

would stick to his guns and continue to decline to testify at the trial (this, as we discussed, was the offer that Officer Dignan accepted and was not allowed to repudiate). We fail to see how these events, unfolding as they did, can accurately be described as a "neat maneuver" by the officers. If there was a "neat maneuver" here (and we have nothing against "neat maneuvers" as many good lawyers—like Evans' savvy counsel in this case—try to use them), it was more likely the offer to waive punitive damages.

Finally, in the last paragraph of her dissent, our colleague notes that Evans "presented substantial evidence of disturbing police malfeasance" in this case. We certainly agree that had the jury gone the other way, it would be difficult to imagine a scenario where its verdict could be set aside. But a jury verdict for the plaintiff, if the defendants were not permitted to testify after saying they wanted to do so before the trial was scheduled to start, might well have presented significant problems on appeal. The closer question was whether the jury should have heard that the defendants invoked their rights under the Fifth Amendment. Sure, that might have helped Evans' case, but to what extent is questionable. The jury knew that Office Dignan invoked the Fifth Amendment, but he was exonerated. Had the other officers' prior invocation of rights been laid before the jury, the officers would have certainly explained that they wanted to speak but, in light of the special prosecutor's inquiry, they were advised by their lawyers to take the Fifth. Their lawyers would have most certainly been called to the stand to say they gave that advice to their clients. How much, if any, significance a jury might assign to a situation like this is unclear, but our guess, under the circumstances of this case, is that it would not have been substantial.

In closing, we note that what happened to Mr. Evans—his wrongful conviction and imprisonment for a

substantial portion of his life—was a tragedy of epic proportions. We know all too well that separating the guilty from the innocent in our system of justice does not, despite requirements of proof beyond a reasonable doubt, always work to perfection. Sometimes innocent people get convicted.[12] The jury here rejected the view that police misconduct, as opposed to something more benign, was the reason why Evans was wrongfully convicted. Yet, even without deliberate police misconduct, we think Illinois should take a close look at its statutory scheme (705 Ill. Comp. Stat. 505/8) for compensating people who have been wrongfully imprisoned. The sum Evans received, apparently $161,000, is, it seems to us, woefully inadequate.

For these reasons, particularly because the deferential (abuse of discretion) standard of review we must apply prohibits us from substituting our judgment for the judgment exercised by Judge Coar in this very difficult case, we AFFIRM the judgment of the district court.

WILLIAMS, *Circuit Judge*, dissenting. What to do when civil litigants invoke the Fifth Amendment's privilege against self-incrimination during discovery but

---

[12] On November 25, 2007, the *New York Times* reported, after an extensive nationwide study, that 206 convicted defendants (205 of them men) have been exonerated, through DNA evidence, since 1989. Fifty-three of the 206 were, like Mr. Evans here, convicted of murder.

waive the privilege on the eve of trial? This is an important question, for when used tactically a late waiver of the privilege can wreak havoc on an opposing party and create a fundamentally unfair trial. As the Third Circuit put it in *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994):

> [T]he adverse party—having conducted discovery and prepared the case without the benefit of knowing the content of the privileged matter—would be placed at a disadvantage. The opportunity to combat the newly available testimony might no longer exist, a new investigation could be required, and orderly trial preparation could be disrupted. In such circumstances, the belated waiver of the privilege could be unfair.

When a court is faced with a party who waives the Fifth Amendment privilege close to trial, it must manage the situation through "means which strike[ ] a fair balance and accommodate[ ] both parties"—that is, "both a litigant's valid Fifth Amendment interests and the opposing parties' needs in having the litigation conducted fairly." *United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 84-85 (2d Cir. 1995). If it finds that the system has been gamed for unfair advantage, the court should either prevent the party from waiving the privilege and testifying at trial, or, as a lesser sanction, allow the opposing party to impeach the formerly silent party with its prior silence. *Harris v. City of Chicago*, 266 F.3d 750, 754 (7th Cir. 2001). None of the decisions that I have cited places the burden on the opposing party to move for a continuance in order to mitigate the prejudice it suffers because of the waiving party's late decision.

This case presents a straightforward legal question: should a district court bar the testimony or allow the impeachment of a party who waives the Fifth Amendment privilege at the last minute, even if the party has left

enough time for *some* discovery in the final, hectic moments before trial? Or should these sanctions be reserved for the situation in which a formerly silent party waits until trial has actually begun before waiving the privilege, thereby precluding any discovery at all? The majority takes the latter position, implicitly if not explicitly; I take the former.

In reaching its conclusion, the majority relies on *Harris*, in which the defendant refused to participate in discovery entirely, and yet was allowed to testify at trial. We reversed the district court's decision to allow the testimony and its refusal to let the plaintiff impeach the defendant with his prior silence, holding that this was "tantamount to allowing [the defendant] to avoid discovery altogether." 266 F.3d at 754. The majority leaves the impression that *Harris* is not simply one situation where sanctions are appropriate—it is the *only* situation where sanctions are appropriate. Some discovery, any discovery—no matter how crammed or last-minute; no matter what tactical advantage it affords the formerly silent party; no matter that it devastates the opposing party's trial preparation—remedies the prejudice caused by a late waiver. This reading of *Harris* is too narrow, and is inconsistent with the decision of our sister circuit in *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 576-77 (1st Cir. 1989) (affirming decision barring party from testifying where party invoked Fifth Amendment for six months during discovery, sought to reverse course one month before trial, and offered to submit to discovery in the days just before trial).

Eight of the defendant police officers invoked their Fifth Amendment rights and refused to participate in discovery for a year and a half. Five weeks before trial and well after the period for fact discovery had closed, seven of them asked to be allowed to waive the privilege and testify at trial. The district court specifically found

that the waiver was untimely and caused prejudiced to Evans. However, as the majority notes, the district court appears to have given the defendants an opportunity to attempt to cure this prejudice by submitting to depositions within ten days. The seven depositions did not occur within ten days of the district court's order; instead, they were completed weeks later, in the nine business days immediately prior to trial. On the first day of trial, after a jury had already been empaneled and just before Evans's opening statement, the district court ruled that not only could the officers testify, but Evans could not even impeach them with their prior silence.

The district court did not provide any explanation for this ruling—which was a bonanza for the defendants—yet the majority would defer to it as a reasonable exercise of discretion. Although we do not know why the district court barred impeachment, the majority assumes that it must have been because the court believed that the frantic depositions had cured all prejudice to Evans. But the majority does not discuss at any length how the district court could have reasonably reached this conclusion, because it does not weigh the prejudice to Evans against the potential curative power of the late discovery. I do so below, and I believe that the facts show that the district court's decision was unreasonable. I wish to emphasize that while I disagree with this particular ruling, I certainly understand the position of a very busy trial judge who finally brings to trial a contentious, hard-fought case and is faced with multiple motions in limine and discovery disputes—matters that are not always presented to a district court with time to spare. Nevertheless, I would announce a rule that a late-waiving party should be penalized not just when its waiver precludes any discovery at all, but also in a case like this, when its waiver prevents its opponent from a meaningful opportunity to conduct discovery.

Before weighing the prejudice to Evans against the impact of the late discovery, I wish to explain, for context, why the circumstances surrounding the defendants' waiver suggest that they were milking their Fifth Amendment privilege for as long as possible with the intention of waiving it just before trial. In this regard, the majority is incorrect when it asserts at page 18 that after Katalinic moved to waive his privilege in November 2005, the other "officers followed suit in January of 2006, around the time the special prosecutor was wrapping up his probe." The other defendants did *not* move to withdraw their assertion of the privilege in January 2006. Their exact words at that time were: "*when and if* the Special Prosecutor concludes its investigation, the defendants who have elected to take the Fifth *may* decide to waive their privilege and testify" (emphasis added). This assertion could hardly have been more equivocal. The defendants did not actually seek to testify until mid-May 2006, approximately five weeks prior to trial. Moreover, it is open to question whether the special prosecutor was "wrapping up his probe" in January 2006, as the majority states. (His investigation did not end until April, *see* Op. at 2, n.1—and he did not issue his report until July.) The point is, when the officers finally sought to waive the privilege in May, nothing had changed in terms of their potential exposure to criminal liability. The special prosecutor's report was not yet released, and they are not arguing that they knew the special prosecutor's findings before he announced them. What apparently *had* changed was that they began to consider just how bad it would look for the seven officers most intimately involved with the Cabassa investigation to refuse to testify at trial for fear of incriminating themselves.

Now to the prejudice to Evans from the defendants' late waiver, beginning with tactical disadvantage he suffered. *See Harris*, 266 F.3d at 755. The defendants sat out

discovery for months and months, and then, after seeing Evans's entire case unfold, they elected to testify. They knew the strengths and weaknesses of his case; they knew where his emphasis lay; they knew what he would ask them about; they had heard testimony from not just all of his fact witnesses, but also all of his expert witnesses. Another aspect of the tactical advantage was the effect of the late depositions on Evans's trial preparation. This was a massive case, lasting over two years from complaint to jury verdict, with over 150 deposition witnesses and a month-long trial. While the defendants' lead counsel was busy preparing for that trial in the week before it began, Evans's lead counsel was personally conducting all seven depositions, which were too critical to Evans's case to be left to a second-chair lawyer. By allowing the defendants to tie up Evans's lawyer's final days before trial in this way, the district court created a serious imbalance between the parties.

Two of the most significant aspects of prejudice Evans suffered involved a semen test in the 1970s and Evans's star witness, Frank Laverty, who died in late 2006. As to the former matter, one of the defendant officers revealed for the first time in a deposition five days before trial began that a semen test had been conducted in the 1970s and *had ruled out Evans*. Evans contends that he was unable to conduct any follow-up discovery on this matter by seeking verification from other witnesses or demanding the production of test results. The defendants' efforts to get around this revelation are wholly unconvincing, especially given that Evans was ultimately exonerated in 2002 based on semen testing. The officer "was most likely mistaken that a test was run," they contend (without citation); they also claim that while semen testing did exist at that time, it was "not reliable." These self-interested and wishy-washy assurances are no substitute for adversarial probing.

Even more importantly, Evans's star witness, Frank Laverty, was terminally ill with cancer in 2006. Laverty was a former Area 2 police officer, and he gave a video-taped deposition that formed one of the centerpieces of the trial with its insider account of the police abuse committed in Area 2. But because of Laverty's health, that deposition was taped before the defendant officers were deposed. Evans's counsel stated at oral argument that Laverty's health in the summer of 2006—when the defendants waived their privilege and were deposed—was too poor for another video deposition. That means that in the testimony that the jury heard, Laverty had nothing to say about the defendants' assertions during their depositions, leaving the impression that there was nothing in those depositions to rebut. The Laverty situation is critical because Evans could not have mitigated this prejudice by seeking a continuance. His star witness was too sick to participate in the trial as scheduled, let alone one at an even later date.

The last-minute depositions did not cure this prejudice. In this regard, I must disagree with the majority that the officers "met the three conditions laid down by the judge" to be allowed to testify. *See* Op. at 11. The district court stated in June 2006, about five weeks before trial, "If they wish to testify, they have to declare that by Wednesday, provide answers to all outstanding discovery, and appear for a deposition within 10 days." If by "appear for a deposition within 10 days," the judge meant that the officers could show up for the depositions and then leave without being deposed, then the officers did indeed meet the condition. But as I read the record, the defendants pushed the depositions to the final days before trial. Shortly after the district court ordered the redepositions, Evans moved to appoint an additional lawyer, Flint Taylor, for help completing this monumental task in such a short amount of time. The defendants objected to Taylor's

participation, saying that he would "harass and intimidate" the officers, and they walked out of their redepositions. Significantly, the magistrate judge rejected the defendants' contention about Taylor and added him as counsel several days later. It's hard to rule out gamesmanship on either side here, but recall that the defendants created this last-minute situation by deciding to testify so late in the process. If the burden was on any party to complete the depositions quickly, it was on them.

The broader lesson of this discovery dispute is that in a massive, acrimonious lawsuit, deposing seven critical witnesses in the nine days before trial simply cannot go off without a hitch. The district court should have recognized that the defendants had created an impossible situation and sanctioned them by allowing Evans to impeach them with their prior silence.

This leads to the question the majority asks: why didn't Evans request a continuance? Again, and critically, a continuance would not have alleviated the prejudice inherent in the Frank Laverty situation—more time would not have allowed Laverty, who was dying, to respond to the defendants' last-minute depositions. But assuming that a continuance should still matter, the majority suggests that the time to request one was June 2006, when the district court ruled that the defendants could testify at trial. That misses the point, for at that time Evans thought the depositions would be completed within ten days, as ordered, rather than in the final moments before trial began. In other words, Evans didn't know just how prejudicial the situation would become. The right question is therefore, why didn't Evans move for a continuance *on the first day of trial*, when he learned that he could not even impeach the defendants with their prior silence? For even if it was until then an open question whether Evans could impeach, the case law gave him every indication that he would be allowed to

by setting out impeachment as the lesser sanction to barring testimony outright. Indeed, in the weeks before trial he was still fighting the preliminary question of whether the defendants should even be allowed to testify, and *Harris* suggests that barring their testimony outright was a real option. I'm sure Evans was shocked on the first day of trial when he learned that on top of the earlier ruling allowing the defendants to testify, evidence of their prior silence would be inadmissible too.

As to why Evans did not request a continuance on the first day of trial, the majority states that the district court would have been receptive to such a request. Again I must disagree. The trial had already begun; the jury was empaneled and opening statements were about to get underway. Moreover, the district judge made it quite clear, especially after the original trial date of January 2006 was disrupted, that he would not push back the trial.[1] I can understand why: this was a very busy trial judge balancing a full criminal docket who understandably (and fairly) wanted to move on with a month-long case. By my count, the district judge rejected no fewer than four motions to continue the trial, including one a month before trial and one the day before trial. On more than one occasion, the judge told counsel in rejecting a motion for continuance things like, "Now gentlemen, don't waste the paper to file a motion for another extension. It's not going to happen." While discussing trial scheduling matters with

---

[1] The majority states at page 17 that the district judge merely denied motions to continue based on "scheduling conflicts." That is incorrect. To take just two examples, the defendants' emergency motion to continue the day before trial argued that publicity over the case and the expected release of the special prosecutor's report would prevent the selection of a fair jury. And the defendants' motion to continue filed in November 2005 asked for more time to conduct discovery.

Evans's counsel a month before trial, the district judge said, "You can make whatever objections you want, but that's going to be the schedule." The judge also said in the final pretrial conference in May 2006, "I won't have time to try this case for almost a year, so—because of other matters pending—so I'm not going to move this trial."

Evans certainly would have made a better record by requesting a continuance, even if only to have it emphatically denied, but the law does not require a futile act. If it is clear that a motion for continuance would be denied, the failure to file one does not constitute waiver. *See United States v. Dellinger*, 472 F.2d 340, 371-72 (7th Cir. 1972); *cf. United States v. Fish*, 34 F.3d 488, 495 (7th Cir. 1994) (failure to seek continuance is not ineffective assistance of counsel where district court's statements show that any motion would have been futile); *Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005) (same).

But as I've noted, because of the prejudice in terms of Laverty's video deposition, the question of a continuance is a red herring. It was also, for Evans, a Catch-22. When he found out, just before his opening statement, that the defendants would not only be allowed to testify after sitting out discovery, but also avoid impeachment with their silence, Evans was put in an unenviable position. Either he proceeded with the scheduled trial at a significant disadvantage, or he moved to postpone for another year a day in court that was 27 years in the making—one that the defendants had already delayed once with a frivolous interlocutory appeal. *See Evans v. City of Chicago*, 445 F.3d 953, 955-56 (7th Cir. 2006) (describing defendants' two arguments as, respectively, "absurd," and "too ridiculous to merit comment"). Since the defendants created this mess with their late waiver, the defendants—not Evans—should have been the ones to face consequences for it. But the defendants suffered no consequences at all: they effectively dodged discovery, got

to testify at trial, and kept the whole thing from the jury. Today's opinion ratifies that neat maneuver, teaching that when a party waives the privilege so late that its opponent suffers prejudice, it is the *opponent*, rather than the waiving party, that has to fix the situation. That is inconsistent with *Harris*, and it is a bad rule—it encourages gamesmanship, puts the district court in a difficult situation, and undercuts the goal of timely and fair discovery.

As the majority notes, "The jury here rejected the view that police misconduct, as opposed to something more benign, was the reason why Evans was wrongfully convicted." *See* Op. at 20. That is true, but it begs the question, would the jury still have reached that decision if it had all the pertinent information? After all, Evans presented substantial evidence of disturbing police malfeasance, including that the defendants repeatedly coerced and threatened their only witness to identify him; that they locked the witness's husband in a room to prevent him from telling prosecutors about the witness's eyesight and credibility problems; that they lied in saying that the witness reported threats from Michael Evans in the weeks after the murder; and that they performed genital inspections on neighborhood boys as a way to pressure them to implicate Evans (which at least one of the boys did).

The main evidence for the other side was the officers' denials. Knowing that the officers were so worried about criminal liability that they refused to speak in their own defense for a full year and a half might have made all the difference to the jury in choosing whom to believe. The majority thinks otherwise, implying that since one officer invoked the Fifth at trial and was nevertheless exonerated, the result would be the same if everyone's silence came out. This argument is best rejected by analogy. If there was a single moment that irrevocably changed the

fortunes of the tobacco industry, it was in April 1994 when the American public saw seven—not one—tobacco company executives raise their right hands and tell Congress that nicotine isn't addictive and that smoking doesn't cause cancer. *See* Allan M. Brandt, *The Cigarette Century: The Rise, Fall, and Deadly Persistence of the Product that Defined America* 366-69 (2007). Similarly here, the power of seven silent Chicago Police officers is not, as the majority suggests, a matter of one plus six. Seven is *exponentially* greater than one. Regardless, the point is not what I think about the impact of the officers' prior silence, or what my colleagues in the majority think. What matters is what the jury would have thought, had it been given the opportunity to consider this critical evidence.

I agree with the majority that what happened to Michael Evans was a tragedy: he spent 27 years in prison for a crime for which he has been exonerated and pardoned. He deserved justice in his civil trial, but he did not receive it because the trial was fundamentally unfair. Accordingly, I respectfully dissent.

A true Copy:

      Teste:

                        _____
                        *Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—1-23-08