In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 10-2951 & 11-2883

TERRANCE THOMPSON,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 1130—**Ronald A. Guzmán**, *Judge.*

ARGUED JANUARY 19, 2012—DECIDED JULY 10, 2013

Before KANNE, SYKES, and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge*. Terrance Thompson was convicted of a state gun crime based entirely on the testimony of officers from the Chicago Police Department's Special Operations Section ("SOS"). He maintained that they fabricated the case against him by planting a gun in the vicinity of his stop and arrest. While he was serving his sentence, the Cook County State's Attorney uncovered widespread corruption in the SOS, implicating the officers

who testified against him. Thompson moved to vacate his conviction and dismiss the case. The State's Attorney agreed to this relief because the officers were not credible. After more than three years in prison, Thompson was released.

Thompson sued the arresting officers for violating his due-process rights under *Brady* by deliberately withholding impeachment evidence, conspiring to violate the *Brady* disclosure duty, and failing to intervene to halt an ongoing *Brady* violation.[1] He also asserted a *Monell* claim against the City of Chicago.[2] The trial presented many complications. During discovery, the individual defendants invoked their Fifth Amendment privilege against self-incrimination, as did other SOS officers who otherwise would have been called as witnesses. To prove his case, Thompson had to rely on his own testimony and the adverse inference from the officers' assertion of the Fifth Amendment. He also wanted to present testimony from other victims of SOS misconduct and the guilty-plea testimony of the SOS officers who were convicted in the corruption investigation. This evidence was important to proving the *Brady* claims—it would help establish that the defendants deliberately withheld critical impeachment evidence of a pattern of malfeasance within the SOS—but the district court excluded much of it.

The jury found just one of the officers liable, and only on the *Brady* claim; it found in favor of all defendants

---

[1]  *See Brady v. Maryland*, 373 U.S. 83 (1963).

[2]  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

on the remaining claims. As damages for Thompson's injury—more than three years of wrongful imprisonment—the jury awarded $15,000. Thompson appeals, challenging the evidentiary rulings noted above and also certain trial tactics by defense counsel that he claims were improper and prejudiced his case.[3]

We agree with Thompson's multiple claims of error. Although none are prejudicial standing alone, their cumulative effect had a substantial and injurious effect on the verdict. We reverse and remand for a new trial on the claims Thompson lost and also on damages.

## I. Background

On September 21, 2002, Thompson was in the area of West Ohio Street and North St. Louis Avenue in Chicago looking to buy drugs. At that time he was a heroin addict. He and several other men were standing on the corner when SOS Officers Carl Suchocki, Tim McDermott, and John Burzinski pulled up in their patrol car. As the police approached, the men on the corner scattered, but Thompson was detained and questioned by the officers, who wanted to know the location of

---

[3] Thompson filed two separate appeals, one from the district court's order denying his motion for a new trial and entering judgment on the verdict (No. 10-2951) and the other from the court's order granting his request for attorney's fees but substantially reducing the award to reflect his limited recovery (No. 11-2883). We have consolidated the appeals.

the drug house and where the drug dealers had gone. While this questioning was underway, Officer Suchocki searched the surrounding area, disappearing for a few minutes down a gangway. He returned with a gun in his hand, saying "look what I got here," and placed Thompson under arrest for unlawfully possessing the firearm. Questioning continued at the police station; the officers demanded that Thompson give them the location of the drug house. He said he didn't know. At some point during the interrogation, SOS Officers Jerome Finnegan and Bret Rice were also present; they were listed as "victims" on the case report. Thompson was eventually charged with aggravated unlawful use of a weapon. *See* 720 ILL. COMP. STAT. 5/24-1.6.

The case went to trial in October 2003. The prosecution relied entirely on the testimony of Officers Suchocki and McDermott. According to the Illinois Appellate Court's description of the trial, Suchocki and McDermott testified that on the afternoon of September 21, 2002, they were on patrol with a third officer, Burzinski, in the 3500 block of West Ohio Street. *See People v. Pearson*, 826 N.E.2d 1099, 1102 (Ill. App. Ct. 2005). They saw a number of people loitering on the corner, and as the officers approached, several individuals started pointing to Thompson and shouting that he had a gun. The officers testified that they saw Thompson grab a gun from his waistband and start to run away. They said they jumped out of their car, ran after Thompson, and saw him toss the gun over a fence during the foot chase. McDermott retrieved the gun while Suchocki caught up with Thompson and arrested him. *Id.*

On the strength of the officers' testimony, Thompson was convicted and sentenced to eight years in prison. On direct appeal the Illinois Appellate Court found a jury-selection error and reversed and remanded for a new trial. *See id.* at 1106-09. The Illinois Supreme Court granted leave to appeal. *See People v. Pearson*, 839 N.E.2d 1033 (Ill. 2005). Thompson remained in prison pending the state high court's review of his case.

In the meantime, in the fall of 2006, about three years into his prison term, Thompson saw a news story about the arrest and indictment of officers in the SOS unit on charges of corruption and other abuses of power. The Cook County State's Attorney had uncovered a long-standing pattern of misconduct within the SOS and was investigating several officers, including Suchocki. Thompson recognized him as one of the officers involved in his arrest who testified against him at trial.

Thompson immediately filed a petition to set aside his conviction, *see* ILL. COMP. STAT. 5/2-1401, arguing that this newly discovered evidence fatally undermined the credibility of the officers who testified against him. The petition questioned the integrity of Suchocki's police work dating back to 2002. The state prosecutor did not oppose the petition. The State's Attorney's Office had adopted a policy of dismissing any cases in which Suchocki and the other SOS officers implicated in the investigation had made an arrest or played a significant role. Assistant State's Attorney ("ASA") Kurt Smitko appeared in court and did not contest the substance of Thompson's section 1401 petition. ASA Smitko conceded

that he could not carry his burden of proof because the officers who testified against Thompson were not credible. In a handwritten order dated December 5, 2006, a Cook County judge vacated Thompson's conviction, dismissed the case, and ordered Thompson released assuming no other holds. On January 9, 2007, the Illinois Supreme Court dismissed as moot its earlier order granting leave to appeal and directed the Illinois Appellate Court to vacate its decision. *See People v. Pearson*, 892 N.E.2d 993 (Ill. 2007). Thompson was released after serving more than three years in prison.

Thompson then brought this suit under 42 U.S.C. § 1983 against the City of Chicago and Officers Suchocki, McDermott, and Burzinski. The initial complaint alleged a series of due-process claims based on *Brady*, including failure to disclose impeachment evidence in violation of the basic *Brady* duty, conspiracy to violate *Brady*, and failure to intervene to prevent an ongoing *Brady* violation. He also alleged an equal-protection violation, a RICO claim, a *Monell* claim against the City, and state-law claims for false imprisonment, false arrest, intentional infliction of emotional distress, and malicious prosecution. Before trial the City stipulated to the entry of judgment against it if the jury found any of the officers liable on any of the constitutional claims, removing the *Monell* issue from the scope of the trial. Pretrial proceedings narrowed the case even further, leaving the following four claims for trial: the alleged *Brady* violation, the *Brady* conspiracy claim, the *Brady* failure-to-intervene claim, and the malicious-prosecution claim. The three

claims based on *Brady* were premised on the same basic factual allegation that the officers had deliberately withheld and conspired to conceal critical impeachment evidence of a pattern or practice of abuse of power by officers within the SOS. Thompson sought to prove the pattern of police misconduct through his own testimony, the testimony of implicated SOS officers, and the testimony of other citizen witnesses who were victims of malfeasance by SOS officers during the relevant time period.

Motions in limine circumscribed the proofs and complicated the task of presenting the case to the jury. Thompson had initially planned to call 11 citizen witnesses to testify about abuses by SOS officers. In protracted pretrial proceedings, the district court issued a series of rulings under Rule 403 of the Federal Rules of Evidence barring four of these witnesses from testifying. Thompson was thereafter stymied in his effort to obtain the presence of certain others at trial; he was unable to serve subpoenas on two, couldn't locate another, and couldn't secure the presence of one more without delaying the trial for two days. Still another citizen witness had credibility problems based on his criminal history, so Thompson decided against calling him. In the end Thompson was left with only two citizen witnesses who would testify about their experience as victims of abuses of power by SOS officers.

In addition to the citizen witnesses, Thompson wanted to call the individual defendants adversely and also certain other SOS officers—Rice, James Eldridge, and

John Blake—who were implicated in the State's Attorney's investigation. During discovery, however, the officers invoked their Fifth Amendment right against self-incrimination. Thompson asked the court for a jury instruction about the permissible adverse inference from the officers' assertion of the Fifth Amendment. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977); *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 389-90 (7th Cir. 1995). The court agreed to give the instruction. Some of the SOS officers—not the defendants here—had pleaded guilty to abuse-of-power charges in connection with the corruption investigation. They, too, indicated their intention to invoke the Fifth Amendment, and Thompson sought to introduce testimony from their guilty-plea hearings. The defendants objected on grounds of unfair prejudice, and the district court likewise excluded this evidence under Rule 403.

Thompson planned to present his own testimony, of course, and before trial he sought to minimize the prejudicial effect of his criminal history on cross-examination. He had a long record of arrests during the past 20 years, but only one conviction in the ten years preceding the trial. The district judge admitted the conviction for impeachment purposes but barred any reference to Thompson's arrest record. Thompson also had a history of using false names during some of his arrests, and the defendants naturally wanted to bring this evidence to the jury's attention. The court allowed it, but in an effort to avoid the obvious inference that Thompson

had used the aliases during arrests—thereby putting his arrest record into evidence through the back door—the judge instructed defense counsel to refer to Thompson's use of aliases "during an important event in your life."

Finally, the judge barred evidence of Officer Suchocki's indictment. This was the subject of heated debate between the parties both before and during the trial. The defense wanted the fact of the indictment admitted, a counterintuitive position that requires some explanation. In brief, under Illinois law a malicious-prosecution claim requires proof that the criminal proceeding against the plaintiff was terminated in a manner "indicative of [the plaintiff's] innocence." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). The defense wanted to argue that Thompson's conviction had been vacated and the case dismissed not because he was innocent but because Suchocki had been indicted. Thompson's position was that if the indictment came in, then its contents should be read to the jury to give a more complete explanation of why Suchocki's testimony was unreliable—to explain, that is, that his testimony was not just unreliable for some reason unrelated to abuse of power but was thoroughly tainted by alleged corruption similar to Thompson's allegations here. The defense objected to admitting the contents of the Suchocki indictment and also insisted that the jury should be told that the indictment was eventually dismissed. The judge resolved the controversy by barring any reference to Suchocki's indictment.

Notwithstanding this hard-fought pretrial ruling, at trial the defense attorney posed a series of questions

about the indictment of SOS officers—including Suchocki—during direct examination of Bernard Murray, Smitko's supervisor in the State's Attorney's Office. Defense counsel also mischaracterized ASA Murray's testimony during closing argument. Thompson's objections on these points were sustained, but he maintains on appeal that substantial damage to his case was done.

The jury found Suchocki liable on the *Brady* claim only. In all other respects, the verdict favored the defense. Suchocki was found not liable on the three remaining claims against him, and the jury found in favor of McDermott and Burzinski across the board. As damages for Thompson's injury of three years of wrongful imprisonment, the jury awarded $15,000.

Thompson moved for a new trial on the claims he had lost and also on damages, but the district court denied the motion. Thompson then requested an award of attorney's fees and costs under 42 U.S.C. § 1988 as the prevailing party. The court granted the motion but reduced the award by 70% based on Thompson's limited success at trial and because he had rejected a "substantial" settlement offer. The court also slashed the hourly rate requested by one of Thompson's lawyers. Thompson appealed from the judgment entered on the jury's verdict and filed a separate appeal from the court's attorney's fees order.

## II.  Discussion

Thompson's appeal raises multiple claims of trial error mostly stemming from the district court's evidentiary rulings. He also argues that the district court reduced his attorney's fees by far too much. We begin with the claimed trial errors, and because we agree that a new trial is warranted, we do not reach the matter of attorney's fees.

Thompson's arguments can be grouped under three main headings. First, he challenges the district court's pretrial exclusion of two categories of evidence under Rule 403: (1) citizen witnesses who planned to testify about specific instances of misconduct within the SOS; and (2) the guilty-plea testimony of officers implicated in the State's Attorney's investigation in which they described prior acts of corruption and other abuses of power by SOS officers, including the defendants. This evidence was directly relevant to the three *Brady* claims and to a lesser degree also was relevant to Thompson's state-law claim for malicious prosecution. Second, Thompson challenges the admission of his use of aliases, which he contends raised an obvious and prejudicial inference about his arrest record. Finally, Thompson argues that defense counsel violated the district court's pretrial ruling barring questions about the Suchocki indictment and then exacerbated the damage by misrepresenting ASA Murray's testimony during closing argument. We take each argument in turn.

## A.  Evidence of SOS Misconduct

Thompson argues that the district court erroneously excluded the following evidence related to his *Brady* claims: (1) the testimony of several citizen witnesses who were victims of misconduct by SOS officers; and (2) the guilty-plea testimony of certain SOS officers who were indicted in connection with the corruption investigation. His principal contention is that the judge misapplied Rule 403, undervaluing the importance of this evidence and overvaluing concerns about unfair prejudice and consumption of trial time with "mini-trials."

The district court has wide discretion in admitting and excluding evidence; we review evidentiary decisions for abuse of discretion only, *see United States v. Wilson*, 437 F.3d 616, 620 (7th Cir. 2006), giving "special deference" to the trial court's determinations, *see United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008). Rule 403 permits the court to exclude otherwise relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

The district court gave two reasons to limit Thompson's presentation of this evidence: unfair prejudice and concerns about extending the length of trial with lots of "mini-trials." Unfair prejudice is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." FED. R. EVID. 403 advisory committee's notes on 1972 Proposed Rules (cited in *Old Chief v. United States*, 519 U.S. 172, 184-85

(1997)). "The amount of prejudice that is acceptable varies according to the amount of probative value the evidence possesses. '[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote.'" *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012) (quoting *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008)).

Concerns about trial efficiency may fit under various Rule 403 headings: confusion of the issues, undue delay, waste of time, and needless presentation of cumulative evidence. "Litigants are not entitled to burden the court with an unending stream of cumulative evidence." *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1171 (7th Cir. 1983). The district court "retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body." *Hamling v. United States*, 418 U.S. 87, 127 (1974). At the same time, however, the district court abuses its discretion if it so limits the evidence that the litigant is effectively prevented from presenting his or her case. *See Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005); *Sec'y of Labor v. DeSisto*, 929 F.2d 789, 796 (1st Cir. 1991) ("[W]e hold that the witness limitation constituted an abuse of discretion in that it prevented both parties from presenting sufficient evidence on which to base a reliable judgment.").

In *MCI Communications*, for example, we held that the imposition of time limits on the trial as a whole is not "*per*

*se*, an abuse of discretion" and that such time limits "may be appropriate in protracted litigation provided that witnesses are not excluded on the basis of mere numbers." 708 F.2d at 1171. But we also noted the importance of flexibility "to accommodate adjustment if it appears during trial that the court's initial assessment was too restrictive." *Id.* With these background principles in place, we proceed to Thompson's complaints about the district court's Rule 403 rulings.

### 1. *Exclusion of citizen witnesses*

The crux of Thompson's *Brady* claim was that Officers Suchocki, McDermott, and Burzinski violated his right to due process by deliberately withholding crucial impeachment evidence before his trial and continuing to conceal it after his conviction while his appeal was making its way through the Illinois courts. *See Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (the due-process duty to disclose exculpatory evidence applies regardless of whether the evidence is requested, includes impeachment evidence, and applies to information known only to the police); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (extending the due-process disclosure obligation under *Brady* to material impeachment evidence); *Engel v. Buchan*, 710 F.3d 698, 706 n.7 (7th Cir. 2013); *Whitlock v. Brueggemann*, 682 F.3d 567, 588 (7th Cir. 2012) (The *Brady* obligation "does not cease to exist at the moment of conviction" but "continues to apply" to the plaintiff's posttrial assertion that he "did not receive a fair trial because of the concealment of exculpatory evi-

dence known and in existence at the time of that trial."); *Steidl v. Fermon*, 494 F.3d 623, 625 (7th Cir. 2007). Thompson also alleged that the officers conspired to violate the *Brady* disclosure duty and failed to intervene to prevent an ongoing *Brady* violation.

The common factual basis of all of the *Brady* claims was that the defendant officers were aware of and participated in a long-standing pattern and practice of corruption within the SOS in which officers regularly fabricated grounds for drug and gun investigations, conducted illegal searches, made false arrests, pursued false criminal charges, and covered up the malfeasance by filing false police reports and giving false testimony. As we have explained, Thompson originally planned to call 11 citizen witnesses to testify about their experiences as victims of the alleged corrupt practices within the SOS. The district court excluded four of those witnesses: Rafael Vergil, Darnell Fields, Thomas Conrad, and Michael Temple.

Rafael Vergil was a Chicago police officer who would have testified that in 2002 Officers McDermott and Burzinski, along with other SOS officers, illegally entered and searched his home, and later made false statements to the Chicago Police Department's Office of Professional Standards to cover up the incident. The district court held that this episode was not "sufficiently connected to this case to be allowed." More specifically, the judge thought that Vergil's testimony was only tangentially relevant because he did not suffer a *Brady* violation.

Darnell Fields was arrested by Officer Burzinski and other SOS officers in May 2002 on a charge of unlawful

use of a weapon. Fields would have testified that the officers falsified evidence leading to an illegal search in which officers discovered a gun in Fields's home and arrested him. The district court excluded Fields's testimony because "[t]his is not a conspiracy to engage in bad police behavior . . . . It's a conspiracy to violate someone's due process rights by failing to disclose information to the government . . . ."

Thomas Conrad would have testified that on June 19, 2003, he was confronted by six SOS officers who searched his bar without grounds and repeatedly demanded that he produce guns. They returned the next day with Officer Suchocki and continued to demand that he produce his guns. The district court provisionally excluded Conrad's testimony because it "doesn't have anything to do with planting evidence, fabricating evidence or lying about evidence in any courtroom proceeding." Thompson argued in response that this incident helped to prove the larger pattern of SOS officers fabricating the grounds for investigations and filing false police reports, particularly in connection with baseless and unlawful searches for guns. The court rejected this argument, noting that although Suchocki had participated in the follow-up search of Conrad's bar, none of the defendants were present during the initial search.

Michael Temple was arrested by Officer Burzinski and other SOS officers in June 2005. He would have testified that Burzinski planted a gun on him, leading to his false arrest. The district court acknowledged that Temple's testimony was "precisely the same type of conduct that's

alleged by the plaintiff in this case." Nevertheless, the court barred Temple from testifying because his June 2005 arrest was "just too far removed from the time frame that we're concerned with here."

Beyond the witnesses whose testimony was specifically excluded on motions in limine, several of Thompson's planned citizen witnesses were not called or did not testify for various other reasons. Donald Wisniewski would have testified that in 2003 Officers Suchocki, McDermott, and Burzinski illegally entered and searched his home, demanding that he produce guns, falsely arrested him, and falsified their police reports about the incident. The district court initially withheld ruling on the admissibility of Wisniewski's testimony. When the matter was revisited on the first day of trial, Thompson acknowledged that the court's earlier rulings excluding other witnesses who were the victims of unlawful home searches also applied to Wisniewski.

In addition, Thompson was unable to serve a subpoena on two other citizen witnesses and decided against calling another based on the witness's criminal history. A final out-of-town citizen witness was scheduled to fly in and testify on the Friday of trial (the trial began on a Monday), but Thompson finished his case-in-chief two days early and decided not to keep the jury waiting to hear that witness's testimony. All in all, Thompson was left with only two citizen witnesses who testified about the pattern of misconduct by SOS officers. These two—Kenya Richmond and Anthony Castro—testified about unlawful searches and falsification of evidence by Officer Suchocki and other SOS officers, but not McDermott and Burzinski.

Thompson argues that the district court abused its discretion in excluding Temple, Vergil, and by implication Wisniewski. The error hurt his case, he contends, because it left him without witnesses who could testify that McDermott and Burzinski were aware of and participated in the pattern of misconduct within the SOS. To establish prejudice, he points to the split verdict: The jury found Suchocki liable for violating *Brady* but cleared him on all other counts and found for McDermott and Burzinski across the board.

The district court seemed to understand that these witnesses were important to Thompson's case: "I'm at a loss to understand how else you prove a pattern of such conduct, if not by the testimony of people who claim to have witnessed it and sufficient testimony to establish not just an isolated incident, but an actual pattern of such conduct . . . ." Nonetheless, in ruling on the defense motions in limine, the court required substantial similarity between the misconduct alleged by the citizen witnesses and the misconduct involved in Thompson's case. The court also seemed to require a temporal link between the misconduct alleged by the citizen witnesses and Thompson's case. Essentially, the court excluded the testimony of SOS victims unless the incident in question involved similar facts and occurred at around the same time as Thompson's arrest.

Thompson maintains that this approach was based on a too narrow view of the purpose and probative value of the pattern-of-misconduct evidence, including the testimony of the citizen witnesses who were victims of

SOS malfeasance. We agree. Requiring close factual similarity to Thompson's case—in other words, requiring a *Brady* due-process violation or something very similar—misses the real point of this evidence. The pattern of misconduct within the SOS *is* the very impeachment evidence that the officers were alleged to have withheld in violation of the basic due-process disclosure duty under *Brady*. Recall that Thompson was convicted and sent to prison based solely on the testimony of Officers Suchocki and McDermott—testimony that the State's Attorney conceded was not credible because of the pattern of corruption in the SOS. Evidence of that pattern of corruption—false investigations and searches, false arrests and charges, and the filing of false police reports to cover up the misconduct—constituted proof of an element of all three *Brady* claims. It helped establish that critical impeachment evidence—the officers' involvement in a pattern of SOS misconduct—existed and was deliberately withheld.

Understood in this light, the testimony of the excluded witnesses was quite probative. Vergil and Wisniewski were prepared to testify that McDermott and Burzinski illegally searched their homes in 2002 and 2003 and filed false reports about the incidents. This evidence tends to prove that the defendants were aware of and participated in abuses of power by the SOS at the relevant time. In particular, the evidence would have helped to prove that the two officers took part in the practice of fabricating grounds for criminal investigations and the subsequent concealment and cover-up. Temple would have testified that Burzinski planted

a gun and falsely arrested him in 2005. This incident was nearly identical to the facts of Thompson's case, but the district court excluded it as "just too far removed" from the time of Thompson's ordeal. This misunderstands the scope of the claimed *Brady* violations. Evidence that Burzinski engaged in the same kind of misconduct in 2005 is powerful circumstantial evidence that he was involved in the pattern of abuse of power by SOS officers dating back to Thompson's arrest in 2002 and trial in 2003. This is especially so in light of the fact that the State's Attorney's investigation of the SOS did not come to fruition until 2006 and revealed a pattern of corruption stretching back to 2002.

In short, the testimony of these witnesses was highly probative. To exclude it under Rule 403 required a finding that its probative value was substantially outweighed by the risk of unfair prejudice to the defendants or a substantial concern about confusion of the issues, waste of time, delay, or cumulative evidence. Unfair prejudice was not asserted, nor was there a serious suggestion that the testimony of these witnesses would be a waste of time or would mislead or confuse the jurors. The testimony was not cumulative—indeed, these were the only citizen witnesses who could testify about McDermott's and Burzinski's participation in the alleged misconduct within the SOS. Instead, the district court precluded these witnesses from testifying based on a generalized concern that admitting this evidence would entail time-consuming "mini-trials." The record does not support this ground for excluding this important evidence. Thompson's counsel indicated

that these witnesses would take a "half day" at most, and indeed the trial proceeded much more quickly than expected. Excluding these witnesses was an abuse of discretion; we will consider the question of prejudice in a moment.

## 2. *Guilty-plea testimony*

Thompson also planned to prove his *Brady* claims through the testimony of five former Chicago police officers who were the defendants' "teammates" in the SOS. Officers Hopkins, Maka, Markiewicz, Villareal, and McGovern pleaded guilty to criminal corruption charges stemming from the State's Attorney's investigation, thus corroborating Thompson's claim that the defendants deliberately withheld critical impeachment evidence about a pattern of corruption within the SOS and conspired with other SOS officers to conceal the evidence. These officers intended to assert their Fifth Amendment privilege against self-incrimination, so Thompson sought to introduce their guilty-plea testimony in which they described nine specific incidents of SOS misconduct between 2003 and 2005.[4] Two of these episodes involved the defendants.

---

[4] The defendants do not argue that the guilty-plea testimony is inadmissible hearsay. It is well-established that a witness who asserts the Fifth Amendment privilege against self-incrimination is "unavailable" for purposes of the exceptions to the hearsay rule under Rule 804 of the Federal Rules of Evidence. *See California v. Green*, 399 U.S. 149, 168 n.17 (1970).

For example, Officer Maka's guilty-plea testimony described an unlawful search and seizure on December 3, 2003, by a group of SOS officers that included Suchocki; the incident included the falsification of police reports and giving false testimony. Similarly, Officer Villareal's guilty-plea testimony described the falsification of grounds for a stop and arrest on May 17, 2005, by a group of SOS officers that included Burzinski; this incident, too, involved falsified police reports and an agreement to give perjured testimony to cover up the misconduct. The common denominator in the guilty-plea testimony of the nonparty officers was the involvement of Officer Finnegan, who was also present during Thompson's interrogation and was listed as a "victim" in the police reports filed on Thompson's arrest.

Regarding Officer Villareal's guilty-plea testimony in particular, the district judge thought the May 17, 2005 incident was just "too late in time" from Thompson's arrest in September 2002. The court also generally characterized the guilty-plea testimony as "a bit redundant" and merely "circumstantial evidence of the existence of a conspiracy as opposed to direct evidence." Ultimately, the court excluded all of the guilty-plea testimony on grounds of unfair prejudice:

> I'm not going to allow the guilty pleas. The prejudice to the defendants, to me, just overwhelms the probative value. I think arguably the evidentiary analysis, that is, the admissibility, is probably on the plaintiff's side; but the prejudicial effect to these defendants of having other people they have no control over take

the Fifth Amendment, the prejudicial effect of having their out-of-court statements given at a time when they had no ability to cross-examine them or question the veracity of those statements, the fact that the statements were given—well, in different proceedings, I think the prejudice that these defendants will be found liable based upon the conduct of others is just too great. It outweighs the probative value of those guilty pleas. So I'm not going to allow them.

The court's concern about the defendants' inability to cross-examine the officers at the time of their pleas was misplaced. As we have explained, "unfair prejudice" under Rule 403 means an undue risk that the jury will decide the case on an improper basis—usually, though not always, because the proffered evidence appeals to emotion more than fact or reason. On this understanding of unfair prejudice, the inability to cross-examine doesn't qualify. The court's second concern—that the jury might be tempted to find the defendants liable based on the outrageous conduct of other officers—is closer to the mark. But it must be heavily discounted here because that risk is always present in a conspiracy claim, which by definition requires proof that the defendant formed an agreement with another to violate the plaintiff's rights. In the context of the specific claims in this case, the probative value of the guilty-plea testimony was significant and the risk of unfair prejudice, properly understood, was modest.

The court's exclusion of this evidence was even more problematic because the unusual circumstances of

this case forced Thompson to structure his claims around the adverse inference from the officers' assertion of the Fifth Amendment in response to questions about misconduct in Thompson's case in particular and within the SOS more generally. The adverse inference is permissible in a civil case but not required, *see Evans v. City of Chicago*, 513 F.3d 735, 740-41 (7th Cir. 2008), and we have held that the inference alone is not enough for a finding of liability, *see LaSalle Bank*, 54 F.3d at 390-91 (adverse inference from Fifth Amendment silence is permissible in a civil case but must be accompanied by other evidence to support liability). Thompson thus needed additional evidence to corroborate the adverse inference that the defendants knew of and participated in a pattern of misconduct within the SOS.

Moreover, at the time of the pretrial rulings, the court assumed that "seven or eight" incidents of SOS misconduct would come in through Thompson's citizen witnesses. By the middle of the trial, that number had dwindled to two, so Thompson asked the court to reconsider its ruling excluding the guilty-plea testimony of the nonparty SOS officers. *See MCI Commc'ns*, 708 F.2d at 1171 (emphasizing the need for flexibility to adjust Rule 403 rulings as needed during trial); *United States v. Dolliole*, 597 F.2d 102, 106 (7th Cir. 1979) (the availability of other methods of proof is an appropriate factor in Rule 403 analysis). The court declined to do so.

We are sensitive to the district court's substantial discretion in weighing the risk of unfair prejudice against the probative value of proffered evidence when ruling

on motions under Rule 403. Still, the exclusion of the guilty-plea testimony based on the risk of unfair prejudice was an abuse of discretion in the unique circumstances of this case for the reasons we have explained. Even if the district court's initial decision to exclude the guilty-plea testimony was not an abuse of discretion, the court erred by not reconsidering it once it became clear that Thompson was left with little corroborating evidence in his claims against McDermott and Burzinski.

### B. Admission of Thompson's Use of Aliases

Thompson also maintains that the court allowed the defense to cross-examine him on his use of aliases in a manner that permitted an obvious and prejudicial inference about his history of arrests. As we have noted, Thompson had been arrested many times over a 20-year period—mostly for drug-related offenses—but was charged and convicted only once in the ten-year period preceding the trial. The district court allowed the use of the conviction for impeachment purposes but barred any reference to the arrests. Thompson also had a history of using an alias when arrested, and he did so again when the defendants arrested him on September 21, 2002, giving the name "Terant Pearson" in connection with that arrest, *see Pearson*, 826 N.E.2d at 1099 (referring to Thompson in the case caption as "Terant Pearson"). He used other false names during earlier arrests.

Understandably, the district court allowed defense counsel to question Thompson on cross-examination about his use of aliases. But the court went further, permit-

ting counsel to question him about 12 specific dates on which he used an alias and listing the particular false names that he used on each occasion. Thompson objected that this cross-examination would completely undermine the exclusion of his arrest record by clearly implying to the jury that he used aliases during arrests. The district court rejected the argument but explored with counsel how this risk of prejudice might be minimized. The court settled on the following approach: Defense counsel was permitted to cross-examine Thompson regarding 12 specific occasions on which he used a false name "during an important event in your life." This line of inquiry, which included the specific aliases Thompson used on the 12 dates, culminated with the following question: "And on this date, on the date we're here for, September 21st, 2002, the date you were arrested, when you were asked to give your name, you said your name was Terant Pearson, correct?"

Thompson strenuously objected at trial and argues on appeal that this "compromise" was highly prejudicial, and rightly so. In general, a witness's arrest record will not be admissible, either because it is inadmissible character evidence under Rule 404(b) or because it is substantially more unfairly prejudicial than probative under Rule 403. There are exceptions, of course. Under Rule 608(b) of the Federal Rules of Evidence, the court may permit cross-examination on specific instances of conduct if probative of the witness's character for truthfulness or untruthfulness. The scope of cross-examination under Rule 608 is subject to Rule 403 balancing, however. Here, the district court conducted that

balancing and sensibly concluded that cross-examination on Thompson's arrest record would be unfairly prejudicial, and the prejudicial effect substantially outweighed the probative value of the evidence. But admitting the alias evidence in such an odd and elaborate way completely undid the protective effect of the exclusion of Thompson's arrest record. Permitting a belabored series of questions in which Thompson was forced to admit to using an alias "during an important event in your life"—12 times in all—is a strange way to guard against unfair prejudice.

This litany of false names used "during an important event in your life" presented the jury with an unmistakable and detailed picture of Thompson's arrest history, particularly when the inquiry culminated with a question specifically addressed to Thompson's use of an alias on the date of his arrest by the defendants. The defendants insist that there is no reason to suppose the jurors connected the dots between "important events" and arrests. An "important event," they point out, "could [be] almost anything," including "a wedding, . . . the birth of a child, . . . starting a new job or business venture, or a host of other situations." This is nonsense. We are quite sure that no juror failed to grasp that the 12 "important events" were arrests.

The jury's award of damages—just $15,000 for more than three years of wrongful imprisonment—suggests that the way in which the alias evidence was admitted was indeed prejudicial. The jurors may have concluded that Thompson was a chronic lawbreaker long accustomed to incarceration. There were other ways

in which Thompson's use of aliases could have been placed before the jury without doing this kind of damage. A single question about his use of an alias during the September 21, 2002 arrest would have sufficed, perhaps accompanied by a summary question confirming that he had used a false name on other occasions as well. But allowing this exaggerated cross-examination regarding 12 separate uses of aliases "during an important event in your life" was an abuse of discretion.

## C.   The Suchocki Indictment and the Malicious-Prosecution Claim

Finally, Thompson argues that defense counsel violated the district court's pretrial order excluding evidence of the Suchocki indictment and made matters worse by misstating ASA Murray's testimony during closing argument. This argument relates to the malicious-prosecution claim, which under Illinois law has the following five elements: (1) the defendant commenced or continued a criminal proceeding against the plaintiff; (2) the proceeding was terminated in favor of the plaintiff; (3) there was no probable cause to commence or continue the proceeding; (4) the defendant acted with malice; and (5) the plaintiff suffered damages as a proximate result of the defendant's conduct. *Swick,* 662 N.E.2d at 1242. In addition, the Illinois Supreme Court has held that "a malicious prosecution action cannot be predicated on underlying criminal proceedings which were terminated in a manner not indicative of the innocence of the accused." *Id.* To put the qualifying point

positively, the second element of the cause of action requires proof that the criminal proceeding was terminated in a manner indicative of the plaintiff's innocence.

The parties vigorously contested whether the gun charge against Thompson was dismissed in a manner indicative of his innocence, and the matter was the subject of much pretrial wrangling. As we have noted, the defendants argued that the fact of the Suchocki indictment should be admitted to show that the case against Thompson was dismissed not because he was innocent but simply because Suchocki was under a cloud of suspicion because of an indictment unrelated to Thompson's case. They insisted, however, that the jury also be informed that the indictment was eventually dismissed. For his part, Thompson argued that if the fact of the indictment came in, then its contents should be admitted as well. The district court ultimately entered a pretrial order barring any reference to the Suchocki indictment.

Notwithstanding this apparently clear ruling, during the direct examination of ASA Murray, defense counsel asked him if Officer Suchocki had been indicted. Thompson objected, citing the court's pretrial ruling, but Murray answered the question "yes" before the judge could sustain the objection and stop him. The judge then excused the jury while the permissible scope of Murray's testimony was sorted out. When the proceedings resumed, defense counsel made no further reference to Suchocki's indictment. But the court never sustained Thompson's objection in the presence of the jury, so

Murray's testimony about the Suchocki indictment was allowed to stand. Defense counsel then took a different tack on the "indicative of innocence" inquiry, asking Murray directly whether the charge against Thompson was dropped because the State's Attorney believed him to be innocent. Thompson again objected, and the court sustained the objection.

The defense attorney returned to this subject during closing argument. Summarizing ASA Murray's testimony, defense counsel told the jurors that "you heard Mr. Murray testify that [Thompson's] dismissal was not indicative of innocence." In fact, ASA Murray did not say this or anything like it; the district court had sustained Thompson's objection to this line of questioning. Thompson again objected, and the district court sustained the objection, reminding the jurors that the arguments of counsel are not evidence.

Thompson argues that defense counsel's questioning and closing argument were improper and had a prejudicial effect on his case, specifically on the question whether the charge against him was dismissed in a manner indicative of his innocence. Again, we agree. Putting the fact of the indictment into evidence without further explanation left the jury with an incomplete and confusing picture. If the grounds for the indictment were in evidence—if the jury knew that Suchocki was indicted for corruption of the sort that Thompson alleged here—then Thompson would have had a stronger argument that the dismissal of the charge against him was more likely than not indicative of his

innocence. On the other hand, if the jury knew only that Suchocki had been indicted, but nothing more, then the unexplained indictment could be used to argue that Thompson was simply the beneficiary of serendipity. The defense could argue, in other words, that Suchocki had gotten himself into trouble for reasons unrelated to the misconduct alleged in this case, and Thompson's prison term was shortened as a result.

Indeed, the defense attorney made use of the unexplained indictment in precisely this way, saying in closing argument that "[c]ircumstances allowed [Thompson] to have his conviction dismissed after he spent three years in jail on an eight-year sentence. That should be reward enough." Counsel then reinforced this misleading argument by referring to nonexistent evidence; namely, ASA Murray's supposed testimony that the dismissal of Thompson's charges was not indicative of his innocence. The district court properly sustained Thompson's objection to this misstatement of the evidence. The remaining question for us is whether this improper line of questions and argument harmed the presentation of Thompson's case. We move to the claim of cumulative prejudice.

### D. Cumulative Prejudicial Error

Viewed in isolation, each of the erroneous evidentiary rulings and improper statements by defense counsel might be insufficient to require a new trial. But we cannot say that their combined effect was harmless. *See United States v. Williams*, 81 F.3d 1434, 1443-44 (7th Cir. 1996) ("It

is the total impact of all the irregularities at trial, rather than the impact of each one examined in isolation, that determines whether a defendant is entitled to a new trial."). Cumulative prejudice occurs when "'(1) . . . multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered the trial fundamentally unfair.'" *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012) (quoting *United States v. Powell*, 652 F.3d 702, 706 (7th Cir. 2011)). Both elements are met here. Thompson has established a long list of trial errors. The district court excluded the testimony of several witnesses who were key to Thompson's *Brady* claims—Chicago residents who claimed to be victims of SOS misconduct. The court refused to admit the guilty-plea testimony of the nonparty SOS officers, which was also highly probative on the *Brady* claims. Together, these rulings left Thompson with little evidence on his claims against McDermott and Burzinski beyond the permissible (but not required) adverse inference from their invocation of the Fifth Amendment. That the jury found Suchocki liable but exonerated McDermott and Burzinski suggests that the exclusion of this evidence was cumulatively prejudicial.

The court also allowed the backdoor admission of Thompson's arrest record, which permitted the jury to infer that he was hardened to incarceration. And defense counsel improperly elicited testimony about the Suchocki indictment, leaving the indictment unexplained, and compounded the error by misstating ASA Murray's testimony during closing argument. This left the jury with the unsubstantiated impression that the dismissal of the

criminal case against Thompson was not indicative of his innocence. It also permitted the jury to infer that he was undeserving of substantial damages for more than three years of wrongful imprisonment.

The cumulative effect of these errors had a "substantial and injurious effect or influence on the determination of [the] jury." *Cerabio,* 410 F.3d at 994. Stated differently, a "significant chance exists that they affected the outcome of the trial." *Mihailovich v. Laatsch,* 359 F.3d 892, 913 (7th Cir. 2004). Considered in combination, the errors prevented Thompson from fairly and adequately presenting his case to the jury. *See Frymire-Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 188 (7th Cir. 1993) ("One or two of these errors might have been excused as harmless. Collectively, however, they presented the jury with such a skewed picture that the verdict is unreliable and must be set aside."). Thompson is entitled to a new trial on the claims that he lost and also on damages.

For all the foregoing reasons, we REVERSE and REMAND for further proceedings consistent with this opinion.